**John F. HOUCK, Jr., Plaintiff,**

v.

**CITY OF PRAIRIE VILLAGE; Charles F. Grover and Barbara Vernon, Defendants.**

**No. 95–4066–RDR.**

United States District Court, D. Kansas.

Sept. 3, 1997.

Harold S. Youngentob, Goodell, Stratton, Edmonds & Palmer, Topeka, KS, for John F. Houck, Jr.

Patricia A. Bennett, Bennett, Lytle, Wetzler, Martin & Pishny, L.C., Prairie Village, KS, Mark D. Katz, Steven D. Steinhilber, Thaddeus J. McDonald, III, Sherman, Taff & Bangert, P.C., Kansas City, MO, for City of Prairie Village, Kan.

Patricia A. Bennett, Bennett, Lytle, Wetzler, Martin & Pishny, L.C., Prairie Village, KS, David W. Hauber, Boddington & Brown, Chtd., Kansas City, KS, for Charles F. Grover and Barbara Vernon.

Lawrence L. Ferree, III, Kirk Thomas Ridgway, Ferree, Bunn & O'Grady, Chtd., Overland Park, KS, for Johnson County Sheriff's Dept.

## MEMORANDUM AND ORDER

ROGERS, Senior District Judge.

This case is now before the court upon defendant City of Prairie Village's motion for summary judgment. Upon careful review of the pleadings, the following facts appear uncontroverted.

*Uncontroverted facts*

Plaintiff was hired as a police officer for the City of Prairie Village on August 22, 1988. This case arises from: plaintiff's arrest by other police officers of the City of Prairie Village on February 5, 1994 while plaintiff was off-duty; plaintiff's incarceration rather than hospitalization from February 5, 1994 to February 7, 1994; and plaintiff's subsequent termination as a police officer for the City of Prairie Village.

Plaintiff has been diagnosed with a variety of mental conditions, including post-traumatic stress syndrome, borderline personality disorder, psychosis from mania, unipolar depression, bipolar depression, clinical depression, chronic depression and chemical imbalance of the brain. Plaintiff has suffered from recurrent suicidal behavior. He was hospitalized in 1991 and 1993 because of these problems. In 1991, plaintiff was suspected of being suicidal. In September 1993, plaintiff was hospitalized following an overdose of medication. He returned to work in December 1993, and his condition was accommodated by the police department. He was permitted to work in a slow manner in a controlled setting. He may have attempted suicide again in February 1994 and May 1994.

By February 5, 1994, plaintiff had stopped taking his medication. He was not in active treatment because he thought he was well. During that day, a Saturday, plaintiff was fighting off and on with his wife, Sherry Houck. He had two or three drinks over a six-hour period. It is unclear whether or how this may have affected plaintiff's behavior, although plaintiff had been advised that drinking alcohol could aggravate an inclination toward suicide. About 4:00 p.m. plaintiff and his wife were fighting in their bedroom and wrestling over a gun. Plaintiff hit his wife. Eventually, plaintiff's wife left the

bedroom. Plaintiff told her to "call 911." After exiting the bedroom, plaintiff's wife heard a gunshot in the bedroom and then called 911. Sherry Houck told the police she heard a gunshot. She was told by the police to exit the house. She did so.

Plaintiff left the bedroom and also exited the house. Officer Thomas was the first Prairie Village police officer to arrive at the scene following the 911 call. Plaintiff told Officer Thomas that he was leaving and that Thomas should not try to stop him. Plaintiff entered his car. Officer Thomas asked plaintiff to stay and to talk with him. Plaintiff complied.

Corporal Jordan and Officers Caster and Thompson then arrived. Corporal Jordan ordered plaintiff to exit his car. Plaintiff did so and started walking toward his house. Corporal Jordan then ordered plaintiff not to enter his house. Plaintiff continued toward the house and said the officers should stay out of his way or he would take them out. Officer Thomas stepped between plaintiff and the front door of the house. Plaintiff then pushed Officer Thomas off the steps of the house and into some bushes.

At that point, plaintiff was arrested. Officer Caster took Sherry Houck's statement and took photographs of her back which showed red marks from plaintiff's blows. Plaintiff was charged with domestic violence and battery on a law enforcement officer.

Plaintiff was held in the booking area of the Prairie Village Police Department for about two hours. During this time he was not handcuffed and he was cooperative. Plaintiff was depressed. He cried periodically and said he felt there was no way out. But, he was able to care for his basic needs and he was not hysterical. For this reason, the officers did not call for professional psychological assistance for plaintiff. Plaintiff said he wished he could receive some kind of help for his depression. Officer Thomas believed plaintiff needed some psychological help. But, it is not unusual for persons to be depressed after being arrested.

Lt. Terry Grove was in his office at the Prairie Village police station when plaintiff was arrested and taken to the station. Lt.

Grove testified that he knew plaintiff was upset. But, he stated that Officers Jordan and Thomas did not say plaintiff was extremely depressed or crying or that he had asked for medical care. Lt. Grove stated that he did not learn plaintiff had made suicidal comments until plaintiff was leaving for the Johnson County detention facility.

The police officers handling plaintiff tried to treat him like any civilian under arrest. Prairie Village police officers exercise discretion in deciding whether to take a person for medical and psychological treatment. On February 5, 1994, the police department had no written rules or guidelines for dealing with persons suffering from psychological disorders. The officers had received some training to look for bizarre behavior, suicidal gestures, and suicidal comments.

Officer Jordan knew plaintiff and was aware of his history of mental problems, hospitalization, and treatment by a psychiatrist. Previously, he had discussed the subject with plaintiff and plaintiff's wife.

Since 1991, the police department had a policy which mandated that persons be arrested for domestic violence when there was evidence that domestic violence had taken place.

The Prairie Village Police Department asked the Johnson County Sheriff's Department to transport plaintiff to the county detention facility. The Sheriff's deputies came to the police department to take custody of plaintiff at approximately 7:00 p.m. on Saturday, February 5, 1994. The deputies were told by the police officers that they were concerned for plaintiff's safety. The deputies replied that they would take care of plaintiff.

As plaintiff was walking toward the transport vehicle, he asked Sgt. Graves of the Johnson County Sheriff's Department if Graves knew that plaintiff was suicidal. Sgt. Graves said he did. He told plaintiff that he would be okay and asked if he wanted to go to the hospital to see a doctor for his back, which was sore. Plaintiff replied that he did not want to see a doctor unless it was a psychiatrist. Sgt. Graves did not have the authority to take plaintiff to the psychiatrist.

Officer Jordan testified that he had never before seen plaintiff like he was on February 5, 1994 and that he told Chief of Police Grover that plaintiff was upset and crying in the booking room. Chief Grover spoke to others regarding plaintiff's condition. But, he made no independent evaluation of plaintiff's state.

The Johnson County detention facility has physicians, a psychologist and a psychiatric nurse on staff. There is no document indicating that plaintiff was screened by a mental health professional or technician at the detention facility. Plaintiff did go through a medical screening process. During this process Deputy Vernon Brown did not note any abnormal behavior. He stated that plaintiff seemed stable and coherent. Nevertheless, plaintiff was put on a five-minute suicide watch. The next day (Sunday), plaintiff was put on continuous watch. Records indicate that a nurse visited him three times, inquired of plaintiff's mental status, and prescribed some Motrin for back pain.

Plaintiff went to court on his criminal charges on Monday, February 7, 1994 at 1:30 p.m.[1] He was released from the detention facility at 2:34 p.m. After he was released, plaintiff entered the hospital for mental health treatment. His physician did not see him until the following morning.

Plaintiff was placed on administrative leave from the police department as of February 7, 1994. He was placed on sick leave from March 14 through May 6, 1994. Plaintiff's wife inquired on or about February 7, 1994 as to whether plaintiff could be placed upon disability leave. Chief of Police Grover wrote that he was not in a position to grant such leave but that he would forward the request to the personnel director.

Lt. Grove conducted an internal investigation of the February 5, 1994 incident involving plaintiff for the Prairie Village police department. He made a recommendation within two weeks of the incident that plaintiff be discharged from the police department. Plaintiff was not interviewed as part of the internal investigation.

Plaintiff filed a complaint on March 26, 1994 with the Kansas Human Rights Commission protesting the disciplinary proceedings which were instituted against him. Several months later, when he was discharged from the police force, plaintiff filed another complaint with the state human rights commission alleging retaliation.

Chief of Police Grover postponed plaintiff's disciplinary hearing at plaintiff's request so that plaintiff could participate. Eventually, a disciplinary hearing was scheduled for October 12, 1994. Plaintiff chose not to attend. On November 4, 1994, Chief of Police Grover sent plaintiff a notice of a pre-termination hearing scheduled for November 18, 1994. The notice states that a file compiled after an investigation indicated that plaintiff had committed domestic battery, battery on a law enforcement officer, as well as violations of the police code of conduct. The notice further indicated that the hearing would provide plaintiff with the opportunity to be heard on the matter and that consideration would be given to a request for representation at the hearing.

Plaintiff made a written response on November 14, 1994. He stated:

I understand that the case against me, based solely on the reports submitted, seems black and white. However, as you already know, neither Sherry or I were interviewed during the final investigation. It is possible that we can present a different viewpoint on the incident.

Once again I would like to ask you to consider my illness and how it affected the incident. This was not a normal case of spousal abuse. It occurred during the mania stage of my illness; a time of which I was suicidal and interested in only that. I did not try to harm anyone, including Officer Thomas.

I also ask that you consider my prior record. Ultimately, plaintiff chose not to appear at the hearing. On November 29, 1994, Chief of Police Grover notified plaintiff that he had reviewed the contents of the internal investigation file and considered plaintiff's past record and facts mentioned in

---

1. The criminal charges were ultimately resolved    through a diversion agreement.

plaintiff's letter of November 14, 1994. He concluded that plaintiff should be discharged. Plaintiff did not appeal this decision.

The Prairie Village Police Department's rules and regulations require that employees obey all laws and conduct themselves on and off duty in a manner which does not bring discredit to themselves or disrepute to the department.

In February 1996, plaintiff testified that he was becoming stabilized for the first time in a number of years. He thought he could handle a desk job in the "special operations" section of the police department, which is the job he had immediately before February 5, 1994. However, plaintiff prefers not to go back into police work.

On April 23, 1994, plaintiff applied for Social Security disability benefits. He was successful and has received Social Security total disability benefits for some time.

Dr. G.R. Wurster, a psychiatrist who has treated plaintiff, has stated that plaintiff was in the midst of an acute psychiatric emergency when he was arrested and that the delay in treatment aggravated his bipolar disorder and caused psychological injury. Plaintiff's wife contacted Dr. Wurster regarding plaintiff after plaintiff was arrested on February 5, 1994. She asked if Dr. Wurster could lend some assistance in getting plaintiff out of jail. Dr. Wurster did not contact the police department or the sheriff's department. He did not consider that his role. But he encouraged plaintiff's wife to have the police or sheriff's department call him. On February 6, 1994, Dr. Wurster was asked by Johnson County detention facility officials whether a hospital would be able to control someone as big and strong as plaintiff. Dr. Wurster said he could not guarantee that plaintiff would be unable to escape from the hospital. After plaintiff entered the hospital on the afternoon of February 7, 1994, normal procedure dictated that nurses would begin treatment after consulting plaintiff's doctor. Dr. Wurster did not see plaintiff at the hospital until February 8, 1994.

Dr. Warren Phillips, another psychiatrist, also believes that plaintiff's condition was aggravated and his recovery prolonged by the delay in getting treatment.

*Plaintiff's claims*

Plaintiff has brought claims against the defendant City of Prairie Village under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213; the Civil Rights Act of 1866, 42 U.S.C. § 1983; and the Kansas law of outrage and implied contract.

*Summary judgment standards*

The standards governing summary judgment motions have been set out previously in another opinion in this case; they are well-established and shall not be repeated here. See *Houck v. City of Prairie Village*, 942 F.Supp. 493, 496 (D.Kan.1996) quoting *Wilson v. Meeks*, 52 F.3d 1547, 1551–52 (10th Cir.1995).

*ADA*

Plaintiff contends that defendant violated plaintiff's rights under the ADA by firing plaintiff instead of granting plaintiff disability leave and making reasonable accommodations to maintain a position for plaintiff as a police officer at the department. Plaintiff also asserts that defendant's actions constituted illegal retaliation under the ADA.

"The ADA provides that '[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" *White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir.1995) quoting 42 U.S.C. § 12112(a).

"[T]o qualify for relief under the ADA, a plaintiff must establish (1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that the employer terminated him because of his disability." *Id.* at 360–61.

Plaintiff's retaliation claim asserts that defendant "retaliated" against plaintiff's request for disability leave and his administra-

tive complaint of March 1994 by discharging plaintiff.

■ "The ADA prohibits a person from discriminating against 'any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.'" *Deghand v. Wal–Mart Stores, Inc.*, 926 F.Supp. 1002, 1015 (D.Kan. 1996) quoting 42 U.S.C. § 12203(a). To succeed upon a claim of retaliation, plaintiff must demonstrate: 1) that he engaged in conduct protected by the ADA; 2) that he suffered an adverse employment action thereafter; and 3) that the adverse action was taken because of his protected activity. *Id.;* see also, *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir.1997).

Defendant asserts that plaintiff was terminated because he engaged in misconduct which disqualified him from the position of police officer. Thus, defendant denies that it discriminated or retaliated against plaintiff. Defendant further asserts that plaintiff is estopped from alleging a violation of the ADA because plaintiff has admitted he cannot work as a police officer by applying for and receiving Social Security disability benefits.

■ The record positively establishes that plaintiff would have maintained his employment as a police officer at the Prairie Village Police Department in spite of his mental illness if he had not violated the law, according to the department, on February 5, 1994. The police department was aware of plaintiff's mental illness and had made accommodations to maintain plaintiff's employment prior to the February 5, 1994 incident. On February 5, 1994, plaintiff engaged in misconduct which he has admitted could be proven to have constituted domestic battery and battery upon a law enforcement officer. This misconduct may have violated not only state criminal law, but also the rules and regulations of the police department.

2. In connection with this contention, the court shall grant plaintiff's motion to supplement and

■ Plaintiff claims that his firing was discrimination because his alleged misconduct was caused by his disability. This claim must be rejected. A person who commits a criminal act as a result of a disabling condition is not excused from the employment consequences of the criminal act because of the disability. Many cases have so held. *E.g., Palmer v. Circuit Court,* 117 F.3d 351, 352–53 (7th Cir.1997) (no duty of accommodation to a mentally ill employee who commits or threatens to commit violent acts); *Harris v. Polk County,* 103 F.3d 696, 697 (8th Cir. 1996) (shoplifting allegedly caused by mental illness may be grounds for failure to hire without violating ADA); *Newland v. Dalton,* 81 F.3d 904, 906 (9th Cir.1996) (Rehabilitation Act not violated by terminating alcoholic who attempted to fire a weapon in a bar); *Williams v. Widnall,* 79 F.3d 1003, 1006–07 (10th Cir.1996) (Rehabilitation Act does not require employer to accept threatening behavior by alcoholic even if the behavior is related to alcoholism); *Maddox v. University of Tennessee,* 62 F.3d 843 (6th Cir.1995) (drunken driving linked to alcoholism may still be grounds for termination under the ADA); *Little v. FBI,* 1 F.3d 255, 259 (4th Cir.1993) (drunken driving and drinking on the job by alcoholic may be cause for termination under Rehabilitation Act).

■ Plaintiff contends that evidence of discrimination may be drawn from comparing his treatment to the treatment of other police officers accused of domestic violence.[2] The court disagrees.

In November 1986, a Prairie Village police officer was accused of domestic battery. He was not arrested. No formal criminal charges were brought. After an internal investigation, the officer was placed on 30–day suspension without pay. This incident occurred more than seven years before the primary events in this case. It occurred before the 1991 implementation of a mandatory arrest policy in domestic violence cases. It occurred during the administration of a different Chief of Police. Lt. Grove helped with the internal investigation of the 1986

plaintiff's additional motion to supplement the record. Doc. Nos. 207 and 209.

incident and plaintiff's arrest. But, this is a trivial point of commonality.

In February 1995 and March 1995, approximately one year after plaintiff's arrest, two Prairie Village police officers were accused of domestic violence in different incidents. In each incident the officer was arrested. One officer eventually resigned as a condition of an agreement to drop his prosecution. The initial internal investigation (by an officer other than Lt. Grove) recommended a 25-day suspension without pay and a six-month probationary period. Upon review by a Lt. Young, it was determined that the claim of domestic battery was not sustained, and the recommended punishment was reduced to a three-day suspension for violation of the use of alcohol/off duty policy.

The other officer was acquitted of charges in a jury trial. The internal investigation of the situation also did not sustain the charge of domestic battery and recommended only a written reprimand for leaving the scene before speaking with the police.

None of the three officers was charged with battery on a law enforcement officer.

The court finds that no reasonable jury would view plaintiff's treatment in comparison with the treatment of these officers as evidence of discrimination on the basis of plaintiff's disability or retaliation for protected conduct. Plaintiff has failed through this evidence or any other evidence or argument to establish that there is a genuine issue for trial as to the motivation for plaintiff's discharge.

Because of the above finding, the court does not need to decide the issue of whether plaintiff's claims under the ADA are barred by plaintiff's receipt of Social Security disability benefits. We note that there is some conflict in the case law on this issue. *E.g.*, *contrast Swanks v. WMATA*, 116 F.3d 582 (D.C.Cir.1997) (no estoppel) with *McNemar v. Disney Store, Inc.*, 91 F.3d 610 (3rd Cir. 1996) *cert. denied,* —— U.S. ——, 117 S.Ct. 958, 136 L.Ed.2d 845 (1997) (estoppel). We also do not have the benefit of any of the statements made by plaintiff or on plaintiff's behalf in support of receiving disability benefits either from a private insurance company or the Social Security Administration.

However, it is clear to the court that even if estoppel was not applied, plaintiff's receipt of disability benefits and statements in support of receiving benefits could well be very persuasive evidence against his ADA claims. *E.g., Swanks,* 116 F.3d at 587. Such evidence could be particularly relevant to this case. Plaintiff appears to claim in his deposition (p.82) that he could return to his previous position with the police department. But, in order to receive Social Security disability benefits, he would have had to have proven otherwise. 20 C.F.R. § 404.1520(e); *Swanks,* 116 F.3d at 585.

To reiterate, we do not decide the instant motion on the basis of estoppel. But, we do believe the law, particularly case law from this district (see *Lowe v. Angelo's Italian Foods, Inc.,* 966 F.Supp. 1036, 1037–38 (D.Kan.1997) (and cases cited therein)), is unfavorable to plaintiff's position either from the application of estoppel principles or simply the weight of the evidence. See also, *Dush v. Appleton Electric Co.,* 124 F.3d 957 (8th Cir.1997) (applying weight of the evidence to affirm summary judgment against ADA plaintiff who received total disability workers' compensation benefits).

*Section 1983*

The scope of plaintiff's claims under 42 U.S.C. § 1983 is somewhat indefinite. In the proposed Second Amended Complaint (Exhibit C to Plaintiff's Response to the Summary Judgment Motion) and in plaintiff's proposed factual contentions and legal theories for the final pretrial order (Exhibit D to Plaintiff's Response to the Summary Judgment Motion), plaintiff suggests that he is suing under § 1983 for violations of the ADA. However, in plaintiff's response to the summary judgment motion, plaintiff's counsel states:

Contrary to the defendant's argument, plaintiff is not using § 1983 as a vehicle to enforce the ADA. Plaintiff's § 1983 claims against Prairie Village are based on Prairie Village's treatment of him at the time of his arrest and its unconstitutional termination of his employment. While factually related to plaintiff's ADA claims, his

§ 1983 claims have an independent basis in § 1983. Further, a plaintiff may bring a § 1983 claim based on actions prescribed by the ADA where, as here, the actions violate not only the ADA but also the United States Constitution.

Doc. No. 178, pp. 57–58.

■ Since the court has found that defendant Prairie Village is entitled to summary judgment upon plaintiff's claims under the ADA, defendant is entitled to summary judgment upon any claims under § 1983 which are contingent upon proof that the ADA was violated or that defendant intentionally discriminated or retaliated against plaintiff on the basis of his mental illness or conduct protected by the ADA. In addition, we agree with the conclusion of the court in *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1531 (11th Cir.1997), that plaintiffs may not maintain a § 1983 action if the only alleged deprivation is of their rights under the ADA.

■ Plaintiff also contends that his rights under the Equal Protection and Due Process Clauses of the Constitution were violated by defendant's conduct in his termination. As for the Equal Protection Clause, disabled persons do not constitute a suspect class; consequently, defendant's conduct will be upheld if it is rationally related to a legitimate governmental objective. *Does v. Chandler*, 83 F.3d 1150, 1155 (9th Cir.1996) citing *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The court does not believe plaintiff can prove that discharging an employee who is believed to have violated the rules of the police department and the criminal laws of the State is irrational. Nor, on the basis of the record before the court, can plaintiff establish that defendant was motivated to discriminate against persons with mental illness when plaintiff was terminated from the police department. As plaintiff has noted, proof of discriminatory intent is necessary to prove an equal protection violation under the Fourteenth Amendment. *Watson v. City of Kansas City*, 857 F.2d 690 (10th Cir.1988).

■ Plaintiff's assertion of procedural and substantive due process violations from his discharge is not well-developed. Whether or not plaintiff was entitled to procedural due process—a question we do not need to address—the procedures employed by defendant satisfied the commands of the Constitution. Pretermination due process requires "oral or written notice of the charges ..., an explanation of the employer's evidence, and an opportunity to present [the employee's] side of the story." *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985). The uncontroverted record indicates that the elements of pretermination due process were satisfied in this instance. Accordingly, the court shall dismiss that portion of plaintiff's claims.

■ Furthermore, it is clear that defendant's action in terminating plaintiff's employment was not so arbitrary, nor did it involve such a fundamental interest, that plaintiff could establish a violation of plaintiff's right to substantive due process, even if plaintiff could demonstrate that it violated police policy, procedures, or an implied contract. See *Planned Parenthood v. Casey*, 505 U.S. 833, 851, 112 S.Ct. 2791, 2806–07, 120 L.Ed.2d 674 (1992) (substantive rights refer to substantive liberties of the person such as "personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education."); *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2nd Cir.1995) (quoting, *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir.1994)) ("Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is 'incorrect or ill-advised.' "); *Phillips v. Calhoun*, 956 F.2d 949, 954 (10th Cir.1992) (citing, *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 467 (7th Cir.1988)) (violations of local ordinances are not *per se* claims of denial of substantive due process); *Mangels v. Pena*, 789 F.2d 836, 839 (10th Cir.1986) ("Rights of substantive due process are founded not upon state provisions but upon deeply rooted notions of fundamental personal interests derived from the Constitution."); *Brenna v. Southern Colo. State College*, 589 F.2d 475, 477 (10th Cir.1978)

("'Substantive' due process requires only that termination of [a property] interest not be arbitrary, capricious, or without a rational basis.").

■ Finally, plaintiff contends that defendant is liable under § 1983 because defendant failed to adopt a policy or train police officers in a manner to prevent the violation of plaintiff's rights to medical care under the Fourteenth Amendment to the Constitution. Specifically, plaintiff asserts that defendant should have trained its police officers to immediately hospitalize persons in plaintiff's condition on February 5, 1994 and to recognize how arresting a fellow police officer suffering from mental illness could aggravate that officer's condition. Defendant is entitled to summary judgment upon this claim as well.

■ As this court has stated previously in this case, the Due Process provisions of the Fourteenth Amendment to the Constitution protect pretrial detainees from deliberate indifference to their medical needs. *Barrie v. Grand County*, 119 F.3d 862 (10th Cir.1997); *Wilson v. Meeks*, 52 F.3d 1547, 1555 (10th Cir.1995); *Estate of Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir.1994); *Houck v. City of Prairie Village*, 942 F.Supp. 493, 497 (D.Kan.1996). This includes the need for psychiatric care. *Houck, supra*; cf., *Belcher v. City of Foley*, 30 F.3d 1390, 1397 (11th Cir.1994) (Eighth Amendment rights of convicted detainees include right to psychiatric and mental health care); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986) (same).

In *Barrie*, the Tenth Circuit relied upon its prior decision in *Berry v. City of Muskogee*, 900 F.2d 1489, 1498 (10th Cir.1990), for a definition of "deliberate indifference." *Barrie* at 119 F.3d 862, 867–68. This court has previously stated that under *Berry*: "To prove deliberate indifference, plaintiff must show: 1) actual knowledge of the specific risk of harm or a risk so substantial that knowledge could be inferred; 2) failure to take reasonable measures to prevent the harm; and 3) that the failure to take such measures in light of the knowledge of the risk of harm, justified liability for the consequences of the failure." *Houck*, 942 F.Supp. at 497; see

also, *Estate of Olivas v. City and County of Denver*, 929 F.Supp. 1329, 1337 (D.Colo. 1996).

In this case, the evidence read in the light most favorable to plaintiff indicates that Prairie Village police officers had the discretion to take arrested persons to a mental hospital instead of to jail. This discretion was exercised at times when officers observed "bizarre" behavior. But, there was no written policy regarding the exercise of such discretion nor any training as to what "bizarre" behavior justified hospitalizing rather than incarcerating arrested persons. In the case at bar, the officers did not exercise their discretion to hospitalize plaintiff even though there was a collective knowledge of his mental illness, prior suicide attempts, and abnormal behavior on the day of his arrest.

■ Summary judgment must be granted in favor of defendant City of Prairie Village upon this claim for the following reasons. First, defendant's right to mental health care was not denied for a significant period of time by the Prairie Village Police Department. Plaintiff was in the custody of the police department for approximately two and one-half hours, and a substantial part of that time involved transportation and information collection. Then plaintiff was transferred to the custody of the Johnson County Sheriff, where there was screening for medical and psychiatric problems and better on-site access to medical and psychiatric care. When the transfer of custody was made, the Prairie Village police officers warned the Johnson County deputies that defendant might be suicidal. These actions do not represent deliberate indifference to a risk of harm or the failure to take reasonable measures to prevent harm. To the contrary, it was a reasonable response, if not the only reasonable response, to the situation.

This response either did not account for or discounted whatever benefit immediate mental health care may have been to plaintiff. In addition, the extra stress or embarrassment which plaintiff felt as a police officer arrested by his fellow officers did not cause the arresting officers to hospitalize plaintiff.

However, the court does not believe the benefits of immediate care or need for such care was so obvious that the officers could be determined to have been indifferent to a specific and substantial risk of harm. In sum, we do not believe plaintiff's right to medical or psychiatric care was denied in this case.

Similarly, we do not believe that defendant's failure to train police officers regarding the possible benefits of immediate psychiatric care or the risks facing arrested police officers with histories of mental illness is actionable in this case. Defendant's officials may have been aware of the risk of suicide in this case. But, there was no suicide in this case. There are ambiguities and subtleties to mental illness and mental health care which even a well-trained police officer should not be expected to master. Under the uncontroverted facts of this case, we do not believe the alleged need for immediate mental health care was so well-known and obvious that the failure of the City of Prairie Village to develop a policy or to train its officers to fulfill that need could be considered deliberate indifference. Cf., *Hutto v. Davis*, 972 F.Supp. 1372 (W.D.Okla.1997) (no liability for failing to train jail officers who knew decedent had ingested drugs prior to detention but failed to prevent death from drug overdose); *Hanrahan v. City of Norwich*, 959 F.Supp. 118, 124–25 (D.Conn.1997) (city not liable for failing to train police officers regarding higher risk of suicide among fellow police officers); *Morris v. City of Alvin*, 950 F.Supp. 804, 806 (S.D.Tex.1997) (city not required to train jailers how to recognize the "ambiguous signs of drug overdose").

Plaintiff has the burden of proving that the defendant acted in disregard of " 'a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights.' " *Barrie*, 119 F.3d at 869, quoting *Berry*, 900 F.2d at 1496. We are persuaded by the record now before the court that plaintiff cannot satisfy this burden before a reasonable jury.

*Outrage*

Plaintiff has made a claim under state law for intentional infliction of emotional distress. This claim is often labeled "outrage." The court has previously considered and ultimately denied this claim as to another defendant in this case. *Houck*, 942 F.Supp. at 497; *Houck v. City of Prairie Village*, 950 F.Supp. 312, 313–14 (D.Kan.1996). For the same reasons advanced in those opinions, the court believes summary judgment should be granted against plaintiff's outrage claim as to defendant City of Prairie Village.

*Implied Contract*

Plaintiff concedes that his implied contract claim should be dismissed.

CONCLUSION

In conclusion, the court shall grant plaintiff's motions to supplement the record and defendant's summary judgment motion as to all claims made against it.

**IT IS SO ORDERED.**